748

Denice H. REIN, individually and as Executrix of the Estate of Mark Alan Rein, deceased, Barbara A. Ahern, individually and as Co–Administrator of the Estate of John M. Ahern, deceased, Thomas A. Ahern, individually and as Co–Administrator of the Estate of John M. Ahern, deceased, Marion K. Alderman, individually and as Administratrix of the Estate of Glenn John Bouckley, deceased, Marion K. Alderman, individually and as Administratrix of the Estate of Paula Alderman Bouckley, deceased, Carolyn Ammerman, individually and as Administratrix of the Estate of Thomas J. Ammerman, deceased, Arnold Asrelsky, individually and as Co–Administrator of the Estate of Rachel Maria Asrelsky, deceased, Hope Asrelsky, individually and as Administrator of the Estate of Rachel Maria Asrelsky, deceased, William Garretson Atkinson, individually and as Administrator of the Estate of William Garretson Atkinson, III, deceased, Dona Bardelli Bainbridge, individually and as Administratrix of the Estate of Harry M. Bainbridge, deceased, Kenneth Stuart Barclay, individually and as Personal Representative of the Estate of Suart Murray Barclay, deceased, Raquel Lopez Benvenuto, individually and as personal Representative of the Estate of Fabrina Benvenuto Caffarone, deceased, Phillip B. Bergstrom, individually and as Administrator of the Estate of Phillip V. Bergstrom, deceased, Sandra Bernstein Clarren, individually and as Administratrix of the Estate of Judith Ellen Bernstein, deceased, Stephanie Laskin Bernstein, individually and as Administratrix of the Estate of Michael Stuart Bernstein, deceased, Francoise Boyer Bardon, individually and as Administratrix of the Estate of Francis Boyer, deceased, Eleanor Hoey Bright, individually and as Administratrix of the Estate of Nicholas Bright, deceased, Diana Browner, individually and as personal Representative of the Estate of Danielle Browner, deceased, Patricia A. Brunner, individually and as Administratrix of the Estate of Colleen R. Brunner, deceased, Julianne Budwick, individually and as Administratrix of the Estate of Eric John Williams, deceased, Brian D, Butler, individually and as Administratir Ad Prosequendum of the Estate of Steven Lee Butler, deceased, Edmundo Luis Caffarone, individually and as personal representative of the Estate of Herman Luis Caffarone, deceased, Graciela Caffarone, individually and as personal representative of the Estate of Herman Luis Caffarone, deceased, Salvatore V. Capasso, individually and as Co–Adminisatrator of the Estate of Gregory J. Capasso, deceased, Betty–Ann Capasso, individually and as Co–Administrator of the Estate of Gregory J. Capasso, deceased, Genevieve Walters, individually and as Administratrix of the Estate of Richard Anthony Cawley, deceased, Daniel Edward Cohen, individually and as Co–Administrator of the Estate of Theodora Eugenia Cohen, deceased, Susan Handler Cohen, individually and as Co–Adminstrator of the Estate of Theodora Eugenia Cohen, deceased, Aldred Corner, as Administrator of the Estate of Tracey Jane Corner, deceased, ELizabeth Delude–Dix, individually and as Administratrix of the Estate of Peter T.S. Dix, deceased, Perry Dorstein, individually and as Administrator of the Estate of David Scott Dornstein, deceased, John M. Flynn, individually and as Administrator of the Estate of John Patrick Flynn, deceased, Euphemia MacAllister Foley, as Administratrix of the Estate of William K. MacKinnon MacAllister, deceased, Lynne R. Moses, individually and as Administratrix of the Estate of Daniel P. Rosenthal, deceased, Lynn Koenig Garczynski, individually and as personal Representative of the Estate of Kenneth R. Garczynski, deceased, Dominique Garrett, individually, Ernest Garrett, as Administrator of the Estate of Paul I. Garrett, Deceased, Wendy Giebler Sifcik, individually and as Administratrix of the Estate of William D. Giebler, deceased, Terri F. Gould, individually and as Executrix of the Estate of David J. Gould, deceased,

Tatiana Guevorguian, individually and as Administratrix of the Estate of Andre Guevorguian, deceased, Anthony B. Hall, individually and as Executor of the Estate of Nicola Jane Hall, deceased, Paul Halsch, individually and as Administrator of the Estate of Lorraine F. Halsch, deceased, Helen Engelhardt Hawkins, as Administratrix of the Estate of Anthony Lacey Hawkins, deceased, Anne L. Hudson, individually and as Administratrix of the Estate of Sophia Hudson, deceased, Robert R. Hunt, individually and as Administrator of the Estate of Karen L. Hunt, deceased, Beverly Braniff Jeck, individually and as Executrix of the Estate of Robert V, Jeck, deceased, Raymond M. Jermyn, Sr., individually and as Co–Administrator of the Estate of Kathleen M. Jermyn, deceased, Margaret M. Jermyn, individually and as Co–Administrator of the Estate of Kathleen M. Jermyn, deceased, Glenn P. Johnson, Jr., individually and as administrator of the Estate of Beth Ann Johnson, deceased, Rita F. Kelly, individually and as Administratrix of the Estate of Julianne F. Kelly, deceased, Patricia Kingham, individually and as Executrix of the Estate of Jay J. Kingham, deceased, Marina M. Kulukundis, as Administratriz of the Estate of Minas Christopher Kulukundis, deceased, Barbara Ann Ludlow, individually and as Special Administratrix of the Estate of Lloyd David Ludlow, deceased, Patricia Audrey Martin, individually and as Executrix of the Estate of Noel G, Martin, deceased, Marjorie G. McKee, individually and as Executrix of the Estate of Charles Dennis McKee, deceased, Rhoda P. Miller, individually and as Executrix of the Estate of Joseph K. Miller, deceased, Gregory P. Morson, individually and as Co–Administrator of the Estate of Eva Ingeborg Morson, deceased, Vanessa C. Morson, individually and as Co–Adminstrator of the Estate of Eva Ingeborg Morson, deceased, Siobhan D. Mulroy, individually and as Executrix of the Estate of John Mulroy, deceased, Judith A. Pagnucco, individually and as Executrix of the Estate of Robert I. Pagnucco, deceased, Ervin Phillips, individually and as Administrator of the Estate of Sarah Phillips, deceased, Lisa Platt, individually and as Administratrix of the Estate of David Platt, deceased, Molena A. Porter, individually and as Administratrix of the Estate of Walter L. Porter, deceased, Jacob Posen, individually and as Co–Administor of the Estate of Pamela Lynn Posen, deceased, Bonnie J. Gregge, individually and As Co–Administrator of the Estate of Pamela Lynn Posen, deceased, FLorencio Quiguyan, individually and as Administrator of the Estate of Estrella C. Quiguyan, deceased, Glendon L. Rafferty, individually and as Administrator of the Estate of Bonnie Leigh Williams, deceased, Yvonne Reeves, individually and as personal Representative of the Estate of Anita Lynn Reeves, Oregon Rogers, individually and as Administrator of the Estate of Lousie Ann Rogers, deceased, John Frick Root, individually and as Administrator of the Estate of Hanne–Maria Maijala Root, deceased, Meryl Shahun Rosen, individually and as Executrix of the Estate of Saul M. Rosen, deceased, Charles M. Rosenthal, individually and as Administrator of the Estate of Andrea Victoria Rosenthal, deceased, Eugene A. Saraceni, individually and as Administrator of the Estate of Elyse J. Saraceni, deceased, Franziska Schauble, individually and as personal Representative of the Estate of Johnannes Otto Schauble, deceased, Ingrid Hoschle, individually and as personal Representative of the Estate of Johannes Otto Schauble, deceased, Petra Scholl, individually and as personal Representative of the Estate of Johannes Otto Schauble, deceased, James L. Schlageter, as Administrator of the Estate of Robert Thomas Schlageter, deceased, John J. Schultz, as Administrator of the Estate of Thomas Britton Schultz, deceased, Madeline B. Shapiro, as Administratrix of the Estate of Amy Elizabeth Shapiro, deceased, George L. Sheanshang, individually and as Administrator of the Estate of Joan Sheanshang, deceased,

Catherine Sigal, individually and as Addministratrix of the Estate of Irving S. Sigal, deceased, Palmer N. Smith, individually and as Administrator of the Estate of James A. Smith, deceased, Roosevelt Smith, as personal Representative of the Estate of Mary E. Smith, deceased, Harvey V. Hall, as Successor Executor of the Estate of Mary E. Smith, deceased, Joan C. Smith, individually and as Co–Administrator of the Estate of Cynthia Joan Smith, deceased, Edward F. Smith, individually and as Co–Administrator of the Estate of Cynthia Joan Smith, deceased, Donald R. Stinnett, Temporary Administrator of the Estate of Michael Gary Stinnett, Donald R. Stinnett, individually and as Administratrix of the Estate of Anthony S. Swan, deceased, Michael Woolf Tager, individually and as Administrator of the Estate of Marc Tagerm deceased, Tadashi Tanaka, as Administrator of the Estate of Hidekazu Tanaka, deceased, Emi Tanaka, as Administrator of the Estate of Hidekazu Tanaka, deceased, Ivy Ng Trimmer–Smith Cobb, individually and as Administratrix of the Estate of David W. Trimmer–Smith, deceased, Vera Van Tienhoven, individually and as personal Representative of the Estate of Thomas F. Van Tienhoven, deceased, Shirin Alaghband Vejdany, individually and as Administratrix of the Estate of Asaad Vejdany, deceased, Michael Waido, individually and as Administrator of the Estate of Janine Waido, deceased, Barbara Matthews Weedon, individually and as Administratrix of the Estate of Kesha Weedon, deceased, Rosanne Weston, individually and as Executrix of the Estate of Jerome Lee Watson, deceased, George H. Williams, individually and as Co–Administrator of the Estate of George W. Williams, deceased, Helena R. Williams, individually and as Co–Administrator of the Estate of George W. Williams, deceased, James K. Wolfe, Individually and as personal Representative of the Estate of Miriam L. Wolfe, deceased, Rosemary Mild, individually and as personal Representative of the Estate of Miriam L. Wolfe, deceased, Everett Woods, individually, Ollie Woods, individually, Brenda Woods–Pruff, individually and as Administratrix of the Estate of Joe Nathan Woods, Sr., deceased, Brenda Woods–Pruff, individually and as Administratrix of the Estate of Joe Nathan Woods, Jr., deceased, Brenda Woods–Pruff, individually and as Administratrix of the Estate of Chelsea Woods, deceased, Elaine Catherine Wright, individually and as Administratrix of the Estate of Andrew Christopher Gillies–Wright, deceased, Veronica Pattie, Donald Moffat, McGlasson Thomas Moffat, Andrew Moffat, Doreen Young, Margaret Moffat, Paul G. Zwynenburg, as Administrator of the Estate of Mark J. Zwynenburg, deceased, Vera Young, Diane Apfelbaum, Individually and as Executor of the Estate of Martin Apfelbaum, deceased, John Boland, Individually and as Co–Administrator of the Estate of Stephen J. Boland, deceased, Jane Boland, Individually and as Co–Administrator of the Estate of Stephen J. Boland, deceased, Geraldine G. Buser, Individually and as Executrix of the Estate of Warren M. Buser, deceased, Geraldine G. Buser, Individually and as Administratrix of the Estate of Michael J. Buser, deceased, Leonard Colasanti, Individually and as Co–Administrators of the Estate of Gary Leonard Colasanti, Joanne Colasanti, Individually and as Co–Administrator of the Estate of Gary Leonard Colasanti, deceased, Margaret Hughston, Individually as surviving spouse and as Representative of the Estate of Willis Larry Coursey, deceased, Rosa Lee Coursey, Individually and as mother of Willis Larry Coursey, deceased, Rosie Lee Coursey, Executrix of the Estate of Willis Washington Coursey post–deceased father of Willis Larry Coursey, deceased, Eileen Carrier, as Executrix of the Estate of Daniel O'Connor, deceased, Judith Pappadopolos, individually and as Executirx of the Estate of Christopher Papadopolos, deceased, William H. Johnson, Individual-

ly and as Administrator Ad Prosequendum of the Estate of Timothy Baron Johnson, deceased, Plaintiffs—Appellees,

v.

SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA, Libyan External Security Organization, also known as JSO, also known as Jamahiriya Security Organization, Libyan Arab Airlines, Defendants—Appellants,

Lamen Khalifa Fhima, also known as Lamin, also known as A Al Amin Khalifa Fhima, Abdel Baset Ali Al–Megrahi, also known as Baset, also known as Abdel Baset Ali Mohmed Al, also known as Abdel Baset Ali Mohamen, Defendants,

United State of America, Intervenor.

Docket No. 98–7467

United States Court of Appeals, Second Circuit.

Argued Nov. 13, 1998.

Decided Dec. 15, 1998.

James P. Kreindler, Kreindler & Kreindler, New York City (Lee S. Kreindler, Steven R. Pounian, Kreindler & Kreindler; Frank H. Granito, Jr., Frank H. Granito, III, Speiser, Krause, Madole, Nolan & Granito; Michel F. Baumeister, Baumeister & Samuels; Jerome L. Skinner, Waite, Scheindler, Bayless & Chesley Co., L.P.A.; Read K. McCaffrey, Patton Boggs L.L.P.; Douglas E. Rosenthal, Sonneschein Nath & Rosenthal, of counsel ) (William S. Presti, Daniel O. Rose, David L. Fiol, Kreindler & Kreindler; Lisa A. MacVitte, Sonneschein Nath & Rosenthal, on the brief) for Plaintiffs–Appellees.

Bruno A. Ristau, Washington, DC; David B. Meltz, Atlanta, GA (Robert C. Mirone, David S. Shields, II, Mirone & Shields, New York City, of counsel) for Defendants–Appellants.

Douglas N. Letter, United States Department of Justice, Washington, DC, for Frank W. Hunger, Assistant Attorney General, and Zachary W. Carter, United States Attorney for the Eastern District of New York (Jonathan B. Schwartz, Linda Jacobson, Jack Chorowsky, Department of State, of counsel) for Intervenor.

Before: CALABRESI and STRAUB, Circuit Judges, and TSOUCALAS, Judge. *

CALABRESI, Circuit Judge:

Defendants-appellants, collectively "Libya," appeal from the denial of their motion to dismiss. The plaintiffs, who are the survivors and representatives of persons killed aboard Pan Am 103 above Lockerbie, Scotland, brought suit against Libya alleging wrongful death, pain and suffering, and a variety of other injuries. Libya moved to dismiss for lack of subject matter jurisdiction, contending that 28 U.S.C. § 1605(a)(7), the provision of the Foreign Sovereign Immunities Act ("FSIA") on which jurisdiction is alleged to be founded, is void as an unconstitutional delegation of the power to establish the jurisdiction of the federal courts. It also sought dismissal for lack of personal jurisdiction or, if its jurisdictional challenges failed, dismissal of certain of the plaintiffs' claims for failure to state a claim on which relief could be granted. The district court denied all aspects of the motion to dismiss, and Libya appealed. We conclude that we have no jurisdiction, on this interlocutory appeal, to review any of the issues that Libya raised in its motion to dismiss other than its challenge to subject matter jurisdiction. We

---

* The Honorable Nicholas Tsoucalas, Judge of the United States Court of International Trade, sitting by designation.

therefore dismiss so much of the appeal as raises these other issues. With respect to the question of subject matter jurisdiction, we find that § 1605(a)(7) is constitutional as applied in this case. We therefore affirm the district court's ruling that it has subject matter jurisdiction over Libya.

## BACKGROUND

On December 21, 1988, Pan Am Flight 103 exploded over Lockerbie, Scotland. All 259 persons on board were killed, as were eleven people on the ground below. The two men named as individual defendants in this suit, both of whom are Libyan, have been indicted in the United States and the United Kingdom in connection with the bombing. Negotiations are currently in progress among the United States, the United Kingdom, and Libya to hold a criminal trial in the Netherlands at which those two men would be tried under Scottish law for allegedly perpetrating the bombing.

In 1994, some of the present plaintiffs brought suit against some of the present defendants, claiming that Libya and its agents were responsible for destroying Pan Am 103. Libya moved to dismiss for lack of jurisdiction under the FSIA or any other applicable law. The FSIA establishes that

foreign states are generally immune from suit.[1] But it gives the federal district courts jurisdiction over actions against such states when either §§ 1605–07 of the Act or relevant international agreements permit them to be sued.[2] Sections 1605–07 enumerate categories of cases in which foreign states are not entitled to sovereign immunity and are, therefore, subject to district court jurisdiction. When the previous litigation was brought in 1994, no provision of the FSIA deprived Libya of sovereign immunity in suits of this sort. Accordingly, the United States District Court for the Eastern District of New York (Platt, J.) dismissed the case for lack of subject matter jurisdiction. *Smith v. Socialist People's Libyan Arab Jamahiriya*, 886 F.Supp. 306 (E.D.N.Y. 1995). We affirmed. *Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239 (2d Cir.1996), *cert. denied,* ―― U.S. ――, 117 S.Ct. 1569, 137 L.Ed.2d 714 (1997).

In 1996, the Antiterrorism and Effective Death Penalty Act ("AEDPA") amended the FSIA by adding what is now 28 U.S.C. § 1605(a)(7). Under this new section, foreign states that have been designated as state sponsors of terrorism are denied immunity from damage actions for personal injury or death resulting from aircraft sabotage.[3]

---

1. 28 U.S.C. § 1604 (1994), a provision of the FSIA, reads, in its entirety: "Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."

2. 28 U.S.C. § 1330(a) (1994), another provision of the FSIA, reads, in its entirety:
    "The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement."
    Although this language could be read to mean that civil actions are divided into jury and nonjury actions, and that, under this section, the district courts have jurisdiction only in nonjury actions, we have in fact read it to mean (1) that the district courts have jurisdiction over civil actions against foreign states regardless of whether those actions, if brought against domestic defendants,

would be jury or nonjury actions, and (2) that all such actions are to be tried without juries. *See Bailey v. Grand Trunk Lines New England*, 805 F.2d 1097, 1101 (2d Cir.1986); *Ruggiero v. Compania Peruana de Vapores "Inca Capac Yupanqui,"* 639 F.2d 872, 875–76 (2d Cir.1981).

3. 28 U.S.C. § 1605 (Supp.1996), another provision of the FSIA, reads, in pertinent part:
    "(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
    . . .
    (7) . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency, except that the court shall decline to hear a claim under this paragraph—
    (A) if the foreign state was not designated as a state sponsor of terrorism under section 6(j)

Shortly after passage of the AEDPA, the present plaintiffs filed (against the present defendants) substantially the same claims that had been previously dismissed.

The defendants moved to dismiss for lack of subject matter jurisdiction and lack of personal jurisdiction and, in the alternative, to dismiss some of the plaintiffs' claims for failure to state a claim on which relief could be granted. *Rein v. Socialist People's Libyan Arab Jamahiriya,* 995 F.Supp. 325, 327 (E.D.N.Y.1998). With respect to subject matter jurisdiction, the defendants claimed that the 1996 amendment to the FSIA was unconstitutional and hence could not create subject matter jurisdiction over Libya. The challenge to personal jurisdiction was based on due process and specifically on the theory of minimum contacts.

On February 26, 1998, the district court denied the defendants' motion to dismiss. Judge Platt ruled (1) that his court had subject matter and personal jurisdiction over the defendants, (2) that the FSIA amendments were constitutional, (3) that pendent jurisdiction existed over the plaintiff's claims for battery and other common-law torts, and (4) that no portion of the action should be dismissed for failure to state a claim. *Id.* at 332.

Libya now appeals.

## DISCUSSION

Libya has raised several issues on this interlocutory appeal, but most of them are not properly before us at this time. Before turning to the merits, therefore, we examine our jurisdiction to review the different aspects of the district court's decision. We conclude that we currently lack jurisdiction to consider any of the appealed issues other than that of sovereign immunity as a defense to subject matter jurisdiction. We then address the subject matter jurisdiction claim.

### I.

(A) Interlocutory appeal and the collateral order exception

This appeal is interlocutory, but our jurisdiction is not founded on the interlocutory

appeals statute. 28 U.S.C. § 1292(a) permits interlocutory appeals regarding injunctions, receiverships, and admiralty issues, none of which is present in this case. 28 U.S.C. § 1292(b) permits interlocutory appeals under certain circumstances when a district judge certifies issues for immediate review, but Judge Platt did not make any such certification in this case. As a result, § 1292 does not apply.

■ Instead, our jurisdiction is founded on the "collateral order" exception to the final order rule. Under this exception, an interlocutory appeal is available for "claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). The Supreme Court has articulated a three-pronged test for determining when the collateral order exception applies. To qualify, an order must "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978).

■ The denial of Libya's motion to dismiss on the grounds of sovereign immunity is appealable as a collateral order. *See Hanil Bank v. PT. Bank Negara Indonesia, (Persero),* 148 F.3d 127, 130 (2d Cir.1998). It is easy to see why the district court's ruling on sovereign immunity meets the first two prongs of *Coopers & Lybrand.* It conclusively determines the issue of subject matter jurisdiction, thus satisfying the first prong, and the issue of jurisdiction is separate from the merits, thus meeting the second.

■ The reason why that ruling meets the third prong is a bit more complex. When an

of the Export Administration Act of 1979 (50 U.S.C.App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371) at

the time the act occurred, unless later so designated as a result of such act[.]"

ordinary, non-sovereign litigant's motion to dismiss for lack of jurisdiction is denied, the denial is entirely reviewable on appeal from final judgment. That is why denials of motions to dismiss for jurisdictional reasons cannot ordinarily be the subject of interlocutory appeals. *See, e.g., Van Cauwenberghe v. Biard,* 486 U.S. 517, 527, 108 S.Ct. 1945, 100 L.Ed.2d 517 (1988); *United States v. Levy,* 947 F.2d 1032, 1034 (2d Cir.1991); *United States v. Layton,* 645 F.2d 681, 683 (9th Cir.1981). But when the jurisdictional issue is one of *immunity,* including sovereign immunity, appeal from final judgment cannot repair the damage that is caused by requiring the defendant to litigate. "[S]overeign immunity is an immunity from trial and the attendant burdens of litigation[.]" *Foremost–McKesson, Inc. v. Islamic Republic of Iran,* 905 F.2d 438, 443 (D.C.Cir.1990) (quoting *Rush–Presbyterian–St. Luke's Med. Ctr. v. Hellenic Republic,* 877 F.2d 574, 576 n. 2 (7th Cir.1989)). A sovereign that is required to litigate a case on the merits before it can appeal the assertion of jurisdiction over it has not been afforded the benefit of the immunity to which it is entitled. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 145, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) (making the same point in the context of the sovereign immunity of the states under the Eleventh Amendment). For this reason we have jurisdiction, on an interlocutory appeal, to review Libya's challenges to subject matter jurisdiction in this case. *See Hanil Bank,* 148 F.3d at 130.

■ It does not follow, however, that we also have jurisdiction to review all of the other aspects of the district court's order on the same interlocutory appeal. The issue of sovereign immunity as a bar to subject matter jurisdiction is within the "collateral order" exception to the final order rule, but the other issues addressed in the parties' briefs—including personal jurisdiction, substantive liability, and punitive damages—are not. The rationale for permitting interlocutory appeal of the sovereign immunity issue does not apply to these other questions. Nor

does some other rationale enable these issues to meet the three requirements of *Coopers & Lybrand.* The argument that the plaintiffs have failed to state a valid claim fails the second prong, because it is not separate from the merits of the case. And all of the issues (other than sovereign immunity as an objection to subject matter jurisdiction) fail the third prong, because they can be reviewed effectively on appeal from final judgment.

(B) *Swint*

1. Limitations on pendent interlocutory review

■ The Supreme Court has, moreover, recently directed the Courts of Appeals not to take "pendent appellate jurisdiction" on interlocutory appeals of issues not themselves immediately appealable. *Swint v. Chambers County Comm'n,* 514 U.S. 35, 51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995). In *Swint,* the district court denied qualified immunity to county officials. Denials of qualified immunity are immediately appealable,[4] and, accordingly, several of the county officials appealed. Their employer, the defendant County Commission, asked the appellate court to exercise "pendent appellate jurisdiction" and to rule at the same time on the County's motion for summary judgment. It requested review regardless of whether there was any independent basis for immediate consideration of its appeal. *Id.,* 514 U.S. at 40, 115 S.Ct. 1203.

The Supreme Court held unanimously that the appellate court, on interlocutory review, lacked jurisdiction over the County's summary judgment motion and could not reach out and decide that issue in the interest of judicial economy. "[C]ourts of appeals," the Court explained, do not have "discretion to append to a *Cohen*-authorized appeal from a collateral order further rulings of a kind neither independently appealable nor certified by the district court." *Id.,* 514 U.S. at 47, 115 S.Ct. 1203. The Court went on to describe the mischief that might

---

4. The reason why denials of qualified immunity are generally appealed immediately is analogous to the reason why interlocutory review is available for denial of sovereign immunity. Qualified

immunity, like sovereign immunity, is an immunity from litigation and not just from liability. *See Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

result from a contrary decision: "[A] rule loosely allowing pendent appellate jurisdiction would encourage parties to parlay *Cohen*-type collateral orders into multi-issue interlocutory appeal tickets." *Id.*, 514 U.S. at 49–50, 115 S.Ct. 1203. That, the Court opined, would eviscerate both the statutory scheme of § 1292, *see Swint,* 514 U.S. at 47, 115 S.Ct. 1203, and the more general principle that, with only limited exceptions, appeals in the federal system should be limited to the review of final orders.

### 2. Pendent parties v. pendent issues

Both Libya and the plaintiffs attempt to distinguish *Swint* from the present appeal. They note, among other things, that in *Swint* the party that tried to raise the jurisdictionally insufficient issue was not the same party that appealed the jurisdictionally sufficient one. In the present case, a single party—Libya—raises all the issues offered for interlocutory review. To put the point in doctrinal terms, the parties would have us distinguish the pendency of *parties* from the pendency of *issues.* But the fact that it is possible to differentiate the two, without more, does not provide a reason why the latter kind of pendency should be treated more permissively than the former.[5]

The Supreme Court explained in *Swint* that the reason why courts of appeals should not take pendent jurisdiction over issues that do not independently qualify for the collateral order exception is that parties should not be encouraged "to parlay *Cohen*-type collateral orders into multi-issue interlocutory appeal tickets." *Id.*, 514 U.S. at 49–50, 115 S.Ct. 1203. A system in which parties could get immediate appellate review of multiple issues once the door was opened for review

of one issue would tempt such parties to rummage for rulings that would authorize interlocutory appeals, thereby securing appellate decisions on many issues without having to wait until after trial.

It is clear that pendent issues raised by the party that has the right to bring an interlocutory appeal are at least as great a threat to the final-order scheme as are pendent issues raised by other parties. Indeed, it appears, if anything, more likely that one party will appeal a flimsy collateral issue with the intention of obtaining interlocutory review for other issues it presses than that different parties will conspire to secure early appellate rulings. The likelihood of one party opening the door and the other party walking through with its otherwise jurisdictionally insufficient claims seems less great than that of one party, having gotten its foot in the door, seeking to bring in everything else it has. We conclude, therefore, that the contention that *Swint* bars pendent interlocutory appellate jurisdiction with regard to pendent parties but does not reach pendent issues gets the relationship between those two categories backwards, and that the Supreme Court's restriction on pendent parties applies, *a fortiori,* to pendent issues raised by a single party. Pendency of parties may appear more *complicated* than pendency of issues, but under *Swint,* it is the pendency of issues that is more *dangerous.*

### 3. Judicial discretion

To be sure, *Swint* did not create an absolute bar to interlocutory appeals of all issues not independently warranting immediate review. It suggested instead that (a) where an issue is "inextricably intertwined" with a

---

5. The Court in *Swint* discussed several prior cases in which courts had faced the issue of pendent jurisdiction on interlocutory appeal, and, in doing so, it did not differentiate between cases involving pendent issues and those involving pendent parties. An example is *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977). The petitioner in *Abney* was a criminal defendant who was authorized under the collateral order doctrine to bring an interlocutory appeal of the denial of his motion to dismiss an indictment on double jeopardy grounds. He also sought to raise another issue, challenging the sufficiency of the indictment. The Su-

preme Court held that the Court of Appeals lacked authority to review the latter claim on interlocutory appeal. *See id.,* 431 U.S. at 662–63, 97 S.Ct. 2034. *Swint* presented *Abney* as an illustration of the proper approach to questions of pendent jurisdiction on interlocutory appeal. *See Swint,* 514 U.S. at 49, 115 S.Ct. 1203. But the motion challenging the sufficiency of the indictment and the motion alleging double jeopardy were both raised by the same party: the defendant. Thus, the rule of *Swint* seems not to be limited to the pendency of *parties.* It applies as well to the pendency of *issues.*

question that is the proper subject of an immediate appeal, or (b) where review of a jurisdictionally insufficient issue is "necessary to ensure meaningful review" of a jurisdictionally sufficient one, an appellate court may exercise pendent jurisdiction. *Id.,* 514 U.S. at 51, 115 S.Ct. 1203. We have read that suggestion restrictively and have held that the two phrases quoted above specify the only circumstances in which we can review immediately an issue that does not independently qualify for interlocutory appeal. *See, e.g., Freeman v. Complex Computing Co.,* 119 F.3d 1044, 1049 (2d Cir.1997). Most of our sister circuits have also adopted a restrictive understanding of the exceptions to *Swint*'s general rule. *See, e.g., Watkins v. City of Oakland,* 145 F.3d 1087, 1091 (9th Cir.1998); *Chambers v. Ohio Dep't of Human Servs.,* 145 F.3d 793, 797 (6th Cir.1998), cert. denied —— U.S. ——, 119 S.Ct. 408, 142 L.Ed.2d 331 (1998); *Thornton v. General Motors Corp.,* 136 F.3d 450, 453 (5th Cir. 1998) (per curiam); *Woolfolk v. Smith,* 81 F.3d 741, 743 (8th Cir.1996) (per curiam); *Taylor v. Waters,* 81 F.3d 429, 437 (4th Cir. 1996); *Sevier v. City of Lawrence,* 60 F.3d 695, 701 (10th Cir.1995); *L.S.T., Inc. v. Crow,* 49 F.3d 679, 683 n. 8 (11th Cir.1995).

The D.C. Circuit, in contrast, has given *Swint* a more permissive reading. *See Gilda Marx, Inc. v. Wildwood Exercise, Inc.,* 85 F.3d 675 (D.C.Cir.1996) (per curiam). As a result, on one occasion it has exercised jurisdiction on an interlocutory appeal in circumstances very similar to those now before us. *See Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,* 115 F.3d 1020 (D.C.Cir.1997). A footnote in *Gilda Marx* had suggested that "inextricably intertwined" and "necessary to ensure meaningful review" should not be considered "a definitive or exhaustive list of conditions" under which *Swint* permits the exercise of pendent appellate jurisdiction. *See Gilda Marx,* 85 F.3d at 679 n. 4. *Jungquist* expanded on that dictum. It held that an appellate court has discretion to exercise pendent jurisdiction on interlocutory appeals when doing so would serve the "inter-

ests of fairness and efficiency." *See Jungquist,* 115 F.3d at 1027. It specified, moreover, that such pendent jurisdiction may exist even over issues that are not inextricably intertwined with issues that formed the basis for permissible interlocutory review.

The question in *Jungquist* was whether the court could review a challenge to personal jurisdiction on the same interlocutory appeal in which it considered a defense of sovereign immunity under the FSIA. Although it rejected the sovereign immunity defense with respect to certain defendants, and therefore established that, as to them, subject matter jurisdiction existed, *id.* at 1028, the court noted that it could conclude the case and spare everyone the need to litigate further by considering the personal jurisdiction question, finding no such jurisdiction, and dismissing on those grounds. *Id.* at 1027. And so it did. *Id.* at 1032–33.

We believe that the D.C. Circuit misinterpreted *Swint.* *Jungquist* would reserve to the courts of appeals a large measure of discretion in deciding when to review pendent issues on immediate appeals of collateral orders. Yet the Supreme Court in *Swint* expressly stated that affording the appellate courts such discretion would undermine the statutory scheme governing interlocutory review. *See Swint,* 514 U.S. at 47, 115 S.Ct. 1203; *see also id.* at nn.4–5 (discussing congressional rejection of the idea that courts of appeals should have discretion of this sort).

■ Accordingly, and adhering to our existing understanding of *Swint* and its exceptions, we hold that when a party takes an interlocutory appeal under the collateral order exception, and that party or any other party seeks simultaneous consideration of another issue that is not independently entitled to interlocutory review, we may not, under *Swint,* take jurisdiction over the latter issue unless it is inextricably intertwined with, or—what is essentially the same thing—its review is necessary to ensure meaningful review of, the former issue.[6] We further hold that this remains the case even if con-

---

6. Thus, we have held that the question of whether a public official defending against a civil suit is entitled to qualified immunity is inextricably intertwined with a determination of what the

plaintiff's clearly established rights were. *See McEvoy v. Spencer,* 124 F.3d 92, 96 (2d Cir. 1997); *Kaluczky v. City of White Plains,* 57 F.3d 202, 207 (2d Cir.1995).

siderations of efficiency argue for deciding both issues on interlocutory review.

## (C) Relationship between subject matter jurisdiction and personal jurisdiction

### 1. Extricability

■ Accordingly, we now inquire whether any of the other issues Libya has raised are inextricably intertwined with its claim of sovereign immunity (that is, with its defense to subject matter jurisdiction). We begin with the question of personal jurisdiction. It is true, as the parties urge, that the two kinds of jurisdiction—subject matter and personal—are interrelated under the FSIA. Pursuant to that statute, there is personal jurisdiction over foreign sovereigns with respect to all claims (a) over which there is subject matter jurisdiction, and (b) as to which process has been properly served. 28 U.S.C. § 1330(b). In other words, the statute makes both service of process and subject matter jurisdiction elements of personal jurisdiction over foreign sovereigns.

It does not follow, however, that a court cannot decide issues of subject matter jurisdiction without at the same time making definitive findings as to personal jurisdiction. For instance, a court could find subject matter jurisdiction without passing on whether there had been effective service of process, thus leaving the personal jurisdiction question open. The current case presents a different example of the same point. Libya's challenge to personal jurisdiction is based on due process and the principle of minimum contacts. We can readily decide whether the district court had subject matter jurisdiction over Libya without at all considering whether it would violate due process to subject Libya to personal jurisdiction. Because review of the latter is not necessary for review of the former, we conclude that the issues of subject matter jurisdiction and personal jurisdiction are not inextricably intertwined in this case.

### 2. Impact of foreign sovereignty

■ The plaintiffs claim, however, that the special nature of suits against foreign sovereigns renders review of the subject matter jurisdiction issue less than meaningful if there is no simultaneous resolution of the personal jurisdiction question. One could understand this argument as having two strands, the first of which is addressed to Libya's *foreignness* and the second of which goes to its *sovereignty*. First, the plaintiffs argue that a foreign sovereign claiming immunity from suit in an American court may justifiably fail to see the distinction between the two kinds of jurisdiction. All that sovereign is interested in is whether the suit will proceed or not. In other words, counsel for the plaintiffs suggests that we should not insist on procedural niceties that from Libya's point of view are either too subtle to be grasped or too provincial to be easily understood.

We reject this contention. It is, in essence, a claim that we should not apply general principles of our law to Libya because Libya, as a foreign litigant, might not comprehend them. But we have no reason to think that sovereign states are less able to understand basic principles of American law than are other litigants. Instead, it seems likely that a foreign nation that maintains laws and courts of its own has considerably greater legal sophistication than do most ordinary plaintiffs and defendants. Moreover, Libya does not appear before this court *pro se*. It has hired distinguished professional counsel whose office it is to explain the law to its client.

The second aspect of this argument is, in essence, that if we are going to release the defendant sovereign from our jurisdiction on appeal from a final order, the comity that one government owes to another instructs that we do so now, thus sparing the sovereign the expense and embarrassment of litigation. This contention might be in point if the litigant to which it was applied were entitled to sovereign immunity. But if Libya were entitled to sovereign immunity, the case would be dismissed for lack of subject matter jurisdiction. And then the question of whether we could review personal jurisdiction interlocutorily would be moot. That question will only be before us if we decide—as we do today—that Libya is *not* entitled to immunity from the present suit. Once we have adjudi-

cated the sovereign immunity question and concluded that there is no immunity, Libya cannot procure dismissal by pressing its failed claim to immune status under another heading (*i.e.*, that of personal rather than subject matter jurisdiction).

### 3. *Hanil Bank*

This court has, on one occasion since *Swint*, decided the question of personal jurisdiction over a foreign sovereign at the same time that it reviewed the issue of subject matter jurisdiction on interlocutory appeal. *See Hanil Bank*, 148 F.3d at 127. The defendant in *Hanil Bank* raised sovereign immunity as a defense to subject matter jurisdiction under the FSIA. *See id.* at 130. The district court rejected that defense, and the defendant, like Libya, took an interlocutory appeal. *Id.* We affirmed the finding of subject matter jurisdiction, addressed the question of personal jurisdiction, and concluded that personal jurisdiction was also present. *Id.* at 134. Accordingly, *Hanil Bank* might seem to be authority for the proposition that, under the FSIA, personal jurisdiction and subject matter jurisdiction are interrelated sufficiently to justify the exercise of pendent appellate jurisdiction.

But there is a crucial difference between *Hanil Bank* and the present case. Subject matter jurisdiction in *Hanil Bank* was founded on 28 U.S.C. § 1605(a)(2), the "commercial activity exception" to sovereign immunity. *Hanil Bank*, 148 F.3d at 130–31. Subject matter jurisdiction in the case *sub judice* is allegedly founded on aircraft sabotage under § 1605(a)(7). These are both provisions of the same statute, but they require widely different showings to establish

jurisdiction. The commercial activity exception defeats sovereign immunity, and thereby establishes subject matter jurisdiction, in actions based on commercial activities conducted either in the United States or, if outside the United States, then with a "direct effect" on the United States. 28 U.S.C. § 1605(a)(2)(1994). The facts of *Hanil Bank* fit within the commercial activities exception, the court found, because they concerned the non-payment of a letter of credit that was to be paid in U.S. dollars into a bank account in New York City. *Id.* at 129–30, 132–33.

Once the court made that determination in *Hanil Bank*, it necessarily had also decided that the defendant had minimum contacts with the United States sufficient to establish personal jurisdiction over it in an American forum without violating the requirements of due process. By agreeing to make payment in New York, *id.* at 132, and in American currency, *id.* at 130, the defendant had "purposefully avail[ed] itself of the privilege of conducting activities within the [United States]." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). This was enough to establish the necessary minimum contacts for personal jurisdiction.

The issue of personal jurisdiction in *Hanil Bank* turned exclusively on due process grounds. *Id.* at 134.[7] The finding of subject matter jurisdiction under the commercial activities exception also entailed a finding of minimum contacts, and that finding was therefore conclusive on the personal jurisdiction question as well.[8] In other words, the issues of subject matter jurisdiction and personal jurisdiction were inextricably intertwined, because the court could not have

---

**7.** Earlier in the litigation, there had also been a challenge to personal jurisdiction on the grounds that service of process had been insufficient, but that issue disappeared after the district court allowed the plaintiff extra time to perfect its service. *See Hanil Bank*, 148 F.3d at 130.

**8.** The Supreme Court has declined to hold that the "direct effects" requirement of the commercial activities exception incorporates the "minimum contacts" test. *See Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 619, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992). (It has also declined to hold the contrary. *See id.*) It is thus possible that a foreign sovereign could be subject to subject matter jurisdiction under the commercial

activities exception without being within the personal jurisdiction of an American court. But *Hanil Bank* did not present that scenario. The findings that underlay subject matter jurisdiction in *Hanil Bank* involved *purposeful availment* and hence minimum contacts. *See Hanil Bank*, 148 F.3d at 130, 132; *see also Weltover*, 504 U.S at 619–20, 112 S.Ct. 2160 (foreign sovereign that issued debt instruments payable in U.S. currency, payable in New York, and appointed agent for transaction in New York had "purposefully availed itself of the privilege of conducting activities within the United States" (internal quotation marks and brackets omitted)).

answered the former without saying everything that was required to answer the latter. Indeed, in *Hanil Bank* the issues were more than inextricably intertwined: they were essentially identical.

The elements of § 1605(a)(7), unlike those of the commercial activities exception as applied in *Hanil Bank*, do not entail any finding of minimum contacts. As a result, in the present case, we can easily decide subject matter jurisdiction and leave key issues of personal jurisdiction unresolved. The two questions are, therefore, not inextricably intertwined. We conclude that, under *Swint*, we lack authority to decide the issue of personal jurisdiction on this interlocutory appeal.

(D) Bill of Attainder and *ex post facto* law challenges

▆ Libya argues that § 1605(a)(7) is unconstitutional as a bill of attainder and as an *ex post facto* law. If that contention challenged the validity of § 1605(a)(7) *tout court*, it would properly be before us on this appeal, because it would constitute an attack on the source of subject matter jurisdiction. As it happens, however, the bill of attainder and *ex post facto* issues are germane, if at all, only to the potential imposition of punitive damages in this suit and not to the existence of jurisdiction. As such, they are not inextricably intertwined with the one issue that is properly before us.

▆ For a law to be unconstitutional as a bill of attainder, it must impose punishment. *See Selective Serv. Sys. v. Minnesota Pub. Interest Research Group*, 468 U.S. 841, 846, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984) (defining bill of attainder as "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial") (quoting *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 468, 97 S.Ct.

2777, 53 L.Ed.2d 867 (1977)). The same is true for a law to be unconstitutional under the *Ex. Post Facto* Clause. *See Collins v. Youngblood*, 497 U.S. 37, 41, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990) (*Ex Post Facto* clause "applies only to penal statutes"); *Doe v. Pataki*, 120 F.3d 1263, 1272 (2d Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1066, 140 L.Ed.2d 126 (1998) (" 'Ex post facto' is a term of art applicable only to 'punishment'— legislative action that retroactively 'punishes as a crime an act previously committed, which was innocent when done,' 'makes more burdensome the punishment for a crime, after its commission,' or 'deprives one charged with crime of any defense available according to law at the time when the act was committed.' "). To assess Libya's argument that § 1605(a)(7) is unconstitutional as a bill of attainder and an *ex post facto* law, we must therefore ascertain whether and how § 1605(a)(7) might be a penal statute.

▆ It is not the case that § 1605(a)(7) imposes punishment (in the relevant sense) simply by subjecting Libya to jurisdiction.[9] Moreover, the burdens of litigation do not of themselves generally constitute "punishment." *See Van Cauwenberghe v. Biard*, 486 U.S. 517, 526 (1988). Once a party's immunity has been removed, and before there is an adverse judgment of guilt or liability, being haled into court does not without more violate that party's cognizable rights. *See id.*; *see also Nixon*, 433 U.S. at 472, 97 S.Ct. 2777 (burdensome circumstances alone, without a judgment of guilt or liability, are not enough to constitute "punishment" under the Bill of Attainder Clause).[10]

Moreover, as the Supreme Court has explained, even a finding of civil liability and the attendant imposition of compensatory damages does not suffice to make the retrospective application of a law invalid. *See Landgraf v. USI Film Prods.*, 511 U.S. 244,

**9.** At oral argument, Libya in effect conceded as much.

**10.** This remains so even if it turns out, on appeal, that the party was not subject to jurisdiction. *See Van Cauwenberghe*, 486 U.S. at 526, 108 S.Ct. 1945. And it makes no difference whether the jurisdiction to which the party is not subject

is personal jurisdiction or jurisdiction over the subject matter. As long as a defendant is not entitled to *immunity*, and therefore privileged against litigation itself, it suffers no legal wrong by the mere fact of suit. As a result, any lack of jurisdiction may be adequately addressed on appeal from a final order. *See id.*

281, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Where a retroactive law is civil rather than criminal, it is only the imposition of *punitive* damages that might, in particular circumstances, raise a constitutional problem. *Id; see also United States v. Ward,* 448 U.S. 242, 248–49, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980) (where penalties are presented as civil rather than criminal, there can be no *ex post facto* issue without "the clearest proof" that "the statutory scheme was so punitive in purpose or effect as to negate" the legislature's designation of the law as civil). Not surprisingly, therefore, Libya focuses its bill of attainder and *ex post facto* claims on the possibility that Libya will be subjected to punitive damages under § 1605(a)(7).

But if it is only the possibility that punitive damages may be assessed that raises the question of the statute's being a bill of attainder or an *ex post facto* law, then those issues are not properly before us at this stage of the case. There has as yet been no trial on the merits and no finding of liability, let alone a punitive damage award. If Libya prevails at trial, these constitutional questions will be moot. The same will be true even if the plaintiffs prevail, should they be awarded only compensatory damages. More important, from the standpoint of the *Cohen* factors, if punitive damages are in the end assessed, there will be ample opportunity to consider both the bill of attainder and the *ex post facto* challenges on appeal from a final order.

Accordingly, the challenges to § 1605(a)(7) as a bill of attainder and as an *ex post facto* law are neither independently eligible for immediate review under the collateral order exception (because they can be effectively reviewed on appeal from final order) nor inextricably intertwined with the sovereign immunity issue (because a challenge to punitive damage awards under a statute is not a challenge to jurisdiction under that statute). On this interlocutory appeal, and again applying *Swint,* those issues are not properly before us.

(E) Failure to state a claim

Finally, Libya contends that some of the plaintiffs' claims fail to state claims on which relief can be granted. We do not address this issue. A motion to dismiss for failure to state a claim is not independently reviewable on interlocutory appeal, *see Digital Equip. Corp. v. Desktop Direct, Inc.,* 511 U.S. 863, 873, 114 S.Ct. 1992, 128 L.Ed.2d 842 (1994), and this argument too is manifestly separable from the issue of sovereign immunity.[11]

## II.

The one aspect of the district court's order that we can review on this appeal is that court's decision that § 1605(a)(7) does not unconstitutionally delegate legislative power by allowing the existence of subject matter jurisdiction over foreign sovereigns to depend on the State Department's determinations of whether particular foreign states are sponsors of terrorism. That decision we review *de novo. See United States v. Murphy,* 979 F.2d 287, 289 (2d Cir.1992).

Section 1605(a)(7) abrogates sovereign immunity in damage actions for personal injury or death arising out of, *inter alia,* acts of aircraft sabotage, provided that the defendant has been designated a state sponsor of terrorism under 50 U.S.C.App. § 2405(j) or 22 U.S.C. § 2371. Designations under these statutes are made by the Secretary of State for the purposes of regulating, respectively, exports and foreign aid. But since the passage of § 1605(a)(7) in 1996, the Secretary's designations affect sovereign im-

---

**11.** That would not be so if the argument that the plaintiffs failed to state a claim asserted that a necessary ground for deprivation of immunity under the FSIA were lacking. Thus, if a foreign sovereign were sued for an airline crash on a negligence theory, rather than on a theory of sabotage, the defendant could assert that even if everything in the complaint were taken as true, there would be no jurisdiction, because § 1605(a)(7) removes sovereign immunity only for claims arising out of aircraft *sabotage* and not for air disasters generally. In such circumstances, a defendant's motion to dismiss for failure to state a claim might well be inextricably intertwined with the issue of sovereign immunity and hence jurisdiction. Whether the question of immunity would then be sufficiently independent of the merits to meet the second prong of *Cohen* need not be considered today.

munity as well. And that, Libya contends, results in an unconstitutional delegation of a core legislative power: the power to determine the subject matter jurisdiction of the federal courts.

■ The district court ruled that § 1605(a)(7) does not unconstitutionally delegate the power to confer jurisdiction because § 1605(a)(7) does not determine jurisdiction at all. It simply deprives Libya, the court said, of an affirmative defense, that of sovereign immunity. *Rein,* 995 F.Supp. at 328–329.[12] To reach that conclusion, it severed two concepts that the Supreme Court has, however, told us must be treated together: sovereign immunity and subject matter jurisdiction. Thus, the Supreme Court has held that sovereign immunity (or, more precisely, the absence of sovereign immunity) is an element of subject matter jurisdiction under the FSIA. *See Verlinden, B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 493–94 & n. 20, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). That is why Libya's assertion of sovereign immunity is offered as a defense to subject matter jurisdiction. As *Verlinden* also made clear, sovereign immunity is not an affirmative defense to suits under the FSIA; it is, instead, a matter of direct jurisdictional moment. *Id.*[13] The power to abrogate (or confer) sovereign immunity is, under the FSIA, therefore the power to confer (or abrogate)

jurisdiction.[14] It follows that the delegation problem cannot be avoided by the reasoning of the district court.

Section § 1605(a)(7), as applied in this case, nonetheless withstands constitutional scrutiny for a different reason. And it does so despite the fact that how far Congress may go in delegating authority to designate or limit the jurisdiction of the federal courts is a complex question that has not yet received a definitive answer.

More than one circuit court has expressed doubts as to whether Congress can constitutionally delegate such a core power as the power to control the jurisdiction of the federal courts. *See Miller v. F.C.C.,* 66 F.3d 1140, 1144 (11th Cir.1995); *United States v. Mitchell,* 18 F.3d 1355, 1360 n. 7 (7th Cir.1994). Despite these doubts, however, the Supreme Court on one occasion long ago upheld the existence of federal court jurisdiction even though that jurisdiction depended on a factual determination that had been delegated to the Department of State. *See Jones v. United States,* 137 U.S. 202, 11 S.Ct. 80, 34 L.Ed. 691 (1890). And this court recently denied jurisdiction on the basis of an analogous finding by the executive branch. See *Matimak Trading Co. v. Khalily,* 118 F.3d 76 (2d Cir.1997), *cert. denied* —— U.S. ——, 118 S.Ct. 883, 139 L.Ed.2d 871 (1998).

---

**12.** The district court also appeared to suggest that § 1605(a)(7) delegated no more than advisory authority on jurisdiction, leaving the courts with discretion to entertain or ignore a defense of sovereign immunity in the case of countries designated as state sponsors of terrorism. *See Rein,* 995 F.Supp. at 329. This approach, however, misreads the statute, which provides that countries so designated *"shall* not be immune from the jurisdiction of courts of the United States" in cases arising from aircraft sabotage or the other circumstances there identified. 28 U.S.C. § 1605(a)(7) (emphasis added). The language of the statute leaves no room for a court to exercise discretion in the way envisioned by the district court.

**13.** This position is consistent with the Court's recent jurisprudence of sovereign immunity in another context: that of suits against states in federal courts. *See Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (holding that the sovereign immunity of states is a jurisdictional issue, not an affirmative defense).

**14.** The district court also made another attempt to construe the FSIA in a way that would prevent § 1605(a)(7) from involving the power to determine jurisdiction: it maintained that the FSIA is actually not a jurisdiction-setting statute at all. Jurisdiction over suits against foreign sovereigns, the district court stated, is conferred on the federal courts by Article III of the Constitution, and the FSIA merely confirms that jurisdiction. *Rein,* 995 F.Supp. at 328–29. If that were the case, and the FSIA were not a jurisdictional statute, then delegating the power to determine the scope of the FSIA would not affect the bounds of federal jurisdiction. But it is well established that the FSIA *is* the source of jurisdiction over actions against foreign states, just as 28 U.S.C. § 1331 is the source of jurisdiction over federal question cases and 28 U.S.C. § 1332 is the source of jurisdiction over diversity claims. *See Ruggiero,* 639 F.2d at 876. Accordingly, the power to determine the applicability of the FSIA can indeed be the power to set the jurisdiction of the federal courts.

The first case occurred more than a hundred years ago, when a man named Jones was indicted in federal court for a murder that occurred on the Caribbean island of Navassa. *See Jones*, 137 U.S. at 216, 11 S.Ct. 80. Jurisdiction to try Jones in an American court depended on the island's status as American territory. The Secretary of State had recently deemed Navassa an island "appertaining to the United States." *Id.* at 217, 11 S.Ct. 80. He had made that announcement pursuant to the Guano Islands Act of 1856, § 1, which empowered the President to declare Caribbean guano islands American. *See id.* at 209, 11 S.Ct. 80. The Supreme Court held that such a declaration could be made "through the Department of State, whose acts in this regard are in legal contemplation the acts of the president." *Id.* at 217, 11 S.Ct. 80. The Court went on to hold that the Secretary's statement did in fact make the island one "appertaining to the United States" and that jurisdiction over Jones's crime was therefore proper. *Id.* at 224, 11 S.Ct. 80.

The second case occurred a year ago, when this court held that alienage jurisdiction— *i.e.,* jurisdiction, under the relevant provision of the diversity statute, in suits between Americans and citizens or subjects of foreign states—could depend on a decision by the executive as to whether a foreign entity is a "state." *See Matimak; see also* 28 U.S.C. § 1332(a)(2) (establishing alienage jurisdiction). The plaintiff was a Hong Kong corporation, and whether alienage jurisdiction applied turned on whether Hong Kong, its place of citizenship, qualified as a foreign state. *See Matimak*, 118 F.3d at 79. The diversity statute does not define "foreign state," nor does it say who has the power to identify foreign states for diversity purposes. Our court held that recognizing foreign states and governments is a function of the executive branch, on whose determination, therefore, the existence of jurisdiction depended. Since the executive had not recognized Hong Kong as a state, diversity jurisdiction was denied. *See id.* at 82–84.

We believe that the Seventh and Eleventh Circuits' expressions of concern are, in fact, reconcilable with the *Jones* and *Matimak* cases. But we need not attempt such a reconciliation today, because in the particular case before us there was no delegation at all. The decision to subject Libya to jurisdiction under § 1605(a)(7) was manifestly made by Congress itself rather than by the State Department. At the time that § 1605(a)(7) was passed, Libya was already on the list of state sponsors of terrorism. No decision whatsoever of the Secretary of State was needed to create jurisdiction over Libya for its alleged role in the destruction of Pan Am 103. That jurisdiction existed the moment that the AEDPA amendment became law.

The issue of delegation might be presented if another foreign sovereign—one not identified as a state sponsor of terrorism when § 1605(a)(7) was passed—was placed on the relevant list by the State Department and, on being sued in federal court, interposed the defense that Libya now raises. It might also arise if a state on the list when § 1605(a)(7) was enacted was later dropped from the list. In that scenario, a *plaintiff* could put forth a claim of unduly delegated authority. But Libya has no similar complaints in the case before us. For that reason, we need not now express any opinion on whether such hypothetical cases would fall within the ambit of *Jones* and *Matimak* or would, instead, implicate the doubts expressed by the Seventh and Eleventh Circuits. As here applied to Libya, § 1605(a)(7) creates jurisdiction directly at the behest of Congress and without any intervening decision by another body. Accordingly, we find no delegation of legislative power and, necessarily, no *unconstitutional* delegation either.

### III.

The district court's determination that subject matter jurisdiction exists over the present action is affirmed. All other aspects of this interlocutory appeal are dismissed for want of appellate jurisdiction.